UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

<table>
<tr><td>ISRAEL RAY COOPER,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH HAGELBERG, ET AL.,<br><br>Defendants.</td><td>No. 4:20-cv-40035-TSH</td></tr>
</table>

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION TO DISMISS AND
ORDER ON PLAINTIFF'S MOTION FOR DISCOVERY

March 9, 2022

Hennessy, M.J.

Pro se Plaintiff Israel Ray Cooper ("Cooper"), an inmate currently housed at Keen

Mountain Correctional Center in Virginia,[1] brings suit pursuant to 42 U.S.C. § 1983 against eight

Department of Corrections ("DOC") personnel:[2] Joseph Hagelberg ("Hagelberg"), Gary Dupuis

("Dupuis"), Robert Sheedy ("Sheedy"), Rowdy W. Hough ("Hough"), Anthony G. Findley

("Findley"), Matthew J. Divris ("Divris"), Kristie J. Ladouceur ("Ladouceur") and Christine

Larkin ("Larkin")[3] (collectively "Defendants").  [Dkt. No. 2 ¶¶ 4–11, 13; see also Dkt. Nos. 27-1

at 1; 33].  Cooper alleges that he was sexually assaulted by another inmate while housed at the

---

[1] At all times relevant to this suit, Cooper was incarcerated in Massachusetts, and was only recently transferred to Virginia.  [See Dkt. Nos. 2 ¶¶ 2–3; 33; 34].

[2] The Court previously dismissed Cooper's claims against Defendants in their official capacities but permitted him to pursue his claims against Defendants in their individual capacities.  [Dkt. No. 10 at 2 ¶ 3].

[3] Cooper spelled Larkin's first name "Kristine" in his summons and this is how it appears on the Electronic Filing System ("ECF").  [See, e.g., Dkt. No. 27].  Cooper does not explain who Larkin is in his complaint, though she is listed as defendant and was served on December 4, 2020.  [See Dkt. Nos. 2; 15].  Defendants maintain that "Larkin has not been properly served with the summons and complaint and does not waive proper service."  [See, e.g., Dkt. Nos. 24 at 1 n.1; 27 at 1 n.1].  Defendants clarify that "Counsel is entering a *limited appearance* on behalf of defendant Larkin for the purposes of this motion to dismiss."  [Dkt. No. 27 at 1 n.1 (emphasis in original)].

North Central Correctional Institution in Gardner, Massachusetts ("NCCI"), and that officials at that facility failed to protect him from harm. [Dkt. No. 2 ¶¶ 13–20, 23]. Cooper further alleges that Defendants initiated false disciplinary proceedings against him and unjustly placed him in segregation for some four months. [Id.]. In doing so, Cooper claims Defendants violated his rights under the Eighth and Fourteenth Amendments. [Id.].

Cooper filed suit on March 20, 2020, seeking a "declaration" from the Court that Defendants violated his constitutional rights, as well as $121,600 in damages plus fees and costs. [Id. at ¶¶ 1, 21–28]. On May 12, 2021, Defendants filed a motion to dismiss all counts in the complaint, based on untimely service of process under Fed. R. Civ. P. 12(b)(5) and failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). [Dkt. Nos. 27 at 1; 27-1 at 13]. Defendants also argue they are entitled to qualified immunity. [Dkt. No. 27-1 at 14]. Cooper filed his opposition to Defendants' motion to dismiss on May 27, 2021, along with a "MOTION for Production of documents and or discovery." [Dkt. Nos. 30 and 31].[4] Defendants did not respond to Cooper's motion for discovery. District Judge Hillman referred both motions to me on October 22, 2021, for a Report and Recommendation on Defendants' motion to dismiss and for an Order on Cooper's motion for discovery. [Dkt. No. 32].

For the reasons discussed below, the undersigned recommends that Defendants' motion to dismiss pursuant to Rule 12(b)(5) be DENIED, but that their motion to dismiss pursuant to Rule 12(b)(6) be GRANTED without prejudice. The Court orders that Cooper's motion for discovery is DENIED.

---

[4] Cooper's Opposition [Dkt. No. 30] and "MOTION for Production of documents and or discovery" [Dkt. No. 31] are two-sided scans that include the front and back of each page. However, Cooper's filing is not double-sided, creating a discrepancy between the page numbers of the original filing and the documents on ECF. For ease of reference, the Court cites page numbers assigned by ECF.

## I.    BACKGROUND

Cooper filed a "sworn affidavit" along with his complaint that includes attachments.[5] [Dkt. No. 3]. Ordinarily, "a motion to dismiss under Rule 12(b)(6) . . . provides no occasion upon which to consider documents other than the complaint." Doe v. Pawtucket Sch. Dep't, 969 F.3d 1, 8 (1st Cir. 2020). "There are exceptions," such as "documents attached to the complaint or incorporated by reference therein" or documents "integral to or explicitly relied upon in the complaint, even though not attached to the complaint." Id. (citations omitted). These exceptions apply here. In his complaint, Cooper "explicitly relie[s] upon" his affidavit and attachments. [E.g., Dkt. No. 2 ¶¶ 12, 17]. Additionally, Defendants cite to Cooper's affidavit in their motion to dismiss.[6] [See Dkt. No. 27-1 at 2].

The chain of events giving rise to this complaint began on November 10, 2019, while Cooper was housed at NCCI. [Dkt. No. 3 at 1]. Around 11:00 PM, Cooper walked into a bathroom and saw two inmates—one of whom was Glover, his future assailant—engaging in "sexually suspicious behavior": the other inmate "quickly mov[ed] his hand away from the groin area of Glover." [Id. at 1, 9]. Cooper made a comment to them, and Glover responded that Cooper "better not be putting bad stuff on his name or there would be issues." [Id. at 1]. On November 12, 2019, while Cooper was using the bathroom around 10:30 PM, Glover began "making lewd noises." [Id. at 1, 6]. Cooper confronted Glover "verbally," and Glover said in response, "fuck you bitch, you must want to see it" and exposed his genitals to Cooper. [Id.]. Cooper, cognizant of his "pending parole," did not respond. [Id. at 6].

---

[5] Cooper filed his affidavit and "attachments" as a single entry. Citations to the "attachments" are therefore to Dkt. No. 3 and the relevant page numbers as assigned by ECF.
[6] Defendants emphasize that Cooper's allegations "are **not** accurate" and they "reserve the right to challenge [the] factual allegations at a later date"—but there seems to be no dispute regarding the authenticity of the documents Cooper submitted with his affidavit. [See Dkt. No. 27-1 at 2 n.2 (emphasis in original)].

Cooper was disturbed by Glover's conduct but was hesitant to report it, fearing other inmates would perceive him negatively.  [Id. at 1, 9].  Two inmates with whom Cooper spoke nevertheless encouraged him to report Glover's conduct, which Cooper then did to "mental health." [Id. at 1, 6, 9].  The following day, November 13, 2019, Cooper also reported Glover's conduct to Defendant Dupuis, a Correction Program Officer ("CPO") at NCCI, who then filed a Prison Rape Elimination Act ("PREA") report.  [Id.].  On November 14, 2019, during a meeting with "Staff Access," Cooper mentioned the incident to Defendant Sheedy, an Inner Perimeter Security ("IPS") officer at NCCI.  [Id.].  Sheedy told Cooper to return later, but when Cooper returned no one was there to take his statement.  [Id.].  Despite these reports, including the "sick call slip sent to mental health,"[7] no one contacted Cooper or otherwise took action.  [Id.].

On the night of November 17, 2019, when Cooper entered the bathroom, Glover was present and said in substance that Cooper "couldn't stay away[.]" [Id. at 6].  As Cooper used a urinal, Glover came up behind Cooper and nudged into him, then placed his hand on Cooper's buttocks and whispered, "I want to fuck you, bitch."  [Id. at 1, 6].  Cooper turned and pushed Glover away, then "struck him in the nose area with an open hand" while shouting for help and telling Glover, "stop touching my ass."  [Id.].  Glover fell on the floor and "began grabbing" and biting at Cooper's legs, attempting to pull him down.  [Id.].  Cooper kicked at Glover's hands and head area "in order to avoid being harmed."  [Id. at 6, 7].  Officer Roy White responded and ordered Cooper to stop.  [Id. at 1].  Recognizing that "help was there," Cooper complied.  [Id. at 1, 4, 6]. No injuries were visible to Glover and there were no injuries to staff.  [Id. at 6].  Cooper was sent to medical and "immediately made a PREA report."  [Id. at 1].

---

[7] The Disciplinary Hearing Statement attached to Cooper's affidavit indicates that there were two sick slips: "On November 13 and 14, 2019 sick slips were submitted so assistance could be sought regarding the actions of Glover." [Dkt. No. 3 at 6].  However, it appears that those sick slips were not received by staff until November 18, 2019, after the November 17, 2019 assault.  [Id.]

The following day, November 18, 2019, Defendant Hagelberg, the NCCI officer responsible for conducting PREA investigations, interviewed Cooper.  [Id. at 1–2, 7].  Hagelberg asked Cooper only a few questions, then read Cooper Miranda rights and informed him that he was being "referred to the D.A. for felony assault."[8]  [Id. at 2].  That same day, Cooper received a written citation for aggravated assault on Glover.  [Id. at 1, 16–17].  Cooper was placed in segregated housing until he was found not guilty of the assault in a DOC disciplinary hearing in March 2020.  [Id. at 1, 3, 10, 22].  On December 3, 2019, Cooper was transferred from NCCI to MCI Concord, and the IPS team "finally recorded [his] statement" on December 6, 2019.  [Id. at 1].

On March 3, 2020, Captain Edward McGonagle ("McGonagle") presided over Cooper's disciplinary hearing at MCI Concord.  [Id. at 2, 4–8].  Cooper pleaded not guilty and was represented by Student Attorneys from Harvard Law School's Prison Legal Assistance Project.  [Id.].  The hearing was tape recorded and included testimony from witnesses and fifteen exhibits.  [Id.].  Cooper testified in his own defense—recounting each interaction with Glover.  [Id. at 5–6, 10, 22].  Officer White testified as the "Reporting Staff Person" that he believed the citation for aggravated assault on Glover contained "a true and accurate account of the incident involving Cooper."  [Id. at 6–7].  Lieutenant Jessica Schedin testified as the Disciplinary Officer and "offered that a preponderance of the evidence has been met against Cooper[.]"  [Id. at 7].  Hagelberg testified that "[p]rior to the November 17, 2019 incident, there was no known conflict between Cooper and Glover," and that, "as a result of the investigative efforts a determination was made that the assault committed against Glover was an unprovoked event and the PREA allegations were made in bad faith, resulting in these allegations being deemed unfounded."  [Id. at 2, 7].  On cross

---

[8] Cooper maintains that "no one took statements" from him regarding the November 17, 2019 assault and, at the same time, that Hagelberg conducted a short interview with him on November 18, 2019.  [Dkt. No. 3 at 1, 2].  Hagelberg testified at Cooper's Disciplinary Hearing that he interviewed Cooper after the assault.  [Id. at 7].  The undersigned infers that Cooper means that Hagelberg interviewed Cooper, but it was perfunctory.

examination, Hagelberg admitted that Dupuis "submitted a Confidential Incident Report containing PREA allegations offered by Cooper" on November 13, 2019, and that a credible informant "did indicate seeing Glover nudging Cooper while at the urinal," but could offer no more details. [Id. at 7]. Hagelberg also acknowledged that he interviewed Glover about the incident and that Glover's version of events was "inconsistent" with the informant's statement, while Cooper's version of events was consistent with it. [Id.]. Additionally, "[a]t least two (2) other interviewed inmates" indicated "hearing Cooper say stop grabbing my ass during this incident," and "one (1) interviewed inmate conveyed [that] Cooper explained how Glover had previously exposed himself to Cooper." [Id.]. Hagelberg also acknowledged that on November 13, 2019, Cooper submitted a "sick slip . . . seeking a mental health appointment." [Id.]. However, "when questioned by Lieutenant Schedin," Hagelberg again "indicated that the allegations made by Cooper could not be corroborated" and that "complaints made by Cooper prior to November 17, 2019 did not involve direct action against Cooper."[9] [Id.].

On March 5, 2020, McGonagle found Cooper not guilty. [Id. at 8]. In a short "Statement of Evidence Relied upon to Support Findings," McGonagle stated that the DOC failed to meet the standards of "preponderance of the evidence" and "failed to meet the burden of proof that the admitted physical actions committed by Cooper against Glover result in an unreasonable application of self-defense force." [Id.]. McGonagle also found that "Glover initiated" the

---

[9] Cooper alleges in his affidavit that Hagelberg lied at the disciplinary hearing by testifying that Cooper never filed a PREA report and that no evidence supported a PREA claim or justified Cooper's assault on Glover. [Dkt. No. 3 at 2, 7]. According to Cooper, this testimony, and any report consistent with it, ignored the fact that another inmate corroborated that Glover nudged Cooper from behind. [Id.]. Cooper asserts that Hagelberg gave false testimony to support his contention that Cooper's assault on Glover was unprovoked and unjustified. [Id.]. The undersigned reads the record in the light most favorable to Cooper and accepts his allegations as true. See Burnham v. Massachusetts, 299 F. Supp. 3d 319, 321 (D. Mass. 2018). Even with a deferential reading, Hagelberg's false testimony does not impact the sufficiency of Cooper's pleadings. As discussed below, to the extent that Hagelberg gave false testimony, this does not serve as a basis for a § 1983 claim in light of Cooper's allegations. See infra section II.B.4 (discussing Cooper's Fourteenth Amendment due process claim).

November 17, 2019 incident in the bathroom, and there was a "reasonable explanation regarding [Cooper's] physical response." [Id.]. Cooper filed suit fifteen days later, on March 20, 2020.

## II.    DEFENDANTS' MOTION TO DISMISS

### A.    Motion to Dismiss for Failure to Effect Timely Service Pursuant to Fed. R. Civ. P. 12(b)(5)

Defendants argue that they were not timely served in breach of Fed. R. Civ. P. 4(m) and this Court's order granting Cooper leave to proceed in forma pauperis. [See Dkt. No. 27-1 at 13–14].[10]  Under Rule 4(m), "[a] plaintiff must serve defendants with process within 90 days of filing a complaint." Bobola v. F/V Expectation, 204 F. Supp. 3d 382, 387 (D. Mass. 2016). "If a plaintiff fails to serve process within that period, then a court 'must dismiss the action without prejudice against that defendant or order that service be made within a specified time.'" Id. "The burden of proof to establish proper service of process following a motion to dismiss pursuant to Rule 12(b)(5) is on the plaintiff." Johnson v. Hodgson, No. 12-10913-MLW, 2015 WL 5609960, at *3 (D. Mass. Sept. 22, 2015) (citing Saez Rivera v. Nissan Mfg. Co., 788 F.2d 819, 822 n.2 (1st Cir. 1986)).

Here, Cooper filed his complaint and a motion for leave to proceed in forma pauperis on March 20, 2020. [See Dkt. Nos. 2; 4; 27-1 at 13]. Accordingly, he was required to serve Defendants on or before June 18, 2020. Cooper did not serve any Defendant by that date. However, when the Court granted Cooper's motion for leave to proceed in forma pauperis on November 10, 2020, it also directed the clerk to "issue summonses" and ordered Cooper to effect service within 90 days. [Dkt. No. 10 at 2–3 ¶¶ 4–6]. Because of Cooper's indigency, the Court permitted him to "elect to have the United States Marshals Service ('USMS') complete service with all costs of

---

[10] Defendants do not cite to Fed. R. Civ. P. 12(b)(5) in their motion to dismiss, but that is the proper vehicle for their claim. See, e.g., Johnson v. Hodgson, No. 12-10913-MLW, 2015 WL 5609960, at *3 (D. Mass. Sept. 22, 2015) ("Failure to make service in accordance with the requirements of Rule 4 permits dismissal under Rule 12(b)(5).").

service to be advanced by the United States." [Id. at 2 ¶ 5]. Cooper thus received a de facto enlargement of time—his new deadline to effect service was February 8, 2021. With the assistance of the USMS, Cooper timely served Defendant Larkin on December 4, 2020.[11] [Dkt. No. 15]. As to the other Defendants, the summonses reflect that they were served on March 22, 2021. [Dkt. Nos. 16–22]. Hence, service of all Defendants except Larkin was untimely.

That is not the end of the analysis, however. In the event of untimely service, "[i]f . . . 'the plaintiff shows good cause for the failure, [a] court must extend the time for service for an appropriate period.'" Bobola, 204 F. Supp. 3d at 387–88 (quoting Rule 4(m)). This Court articulated the following standard for demonstrating good cause:

> [G]ood cause is likely (but not always) to be found when the plaintiff's failure to complete service in timely fashion is a result of a third person, typically the process server, the defendant has evaded service of the process or engaged in misleading conduct, the plaintiff has acted diligently in trying to effect service or there are understandable mitigating circumstance, or the plaintiff is proceeding *pro se* or *in forma pauperis*. *Pro se* status or any of the other listed explanations for a failure to make timely service, however, is not automatically enough to constitute good cause for purposes of Rule 4(m).

Id. at 388 (quoting McIsaac v. Ford, 193 F. Supp. 2d 382, 383 (D. Mass. 2002). Here, the record supports a finding of good cause for failure to timely serve Defendants. First, Cooper checked on the status of his case prior to the initial service deadline through a letter dated May 20, 2020, in which he noted that he had "not received any correspondence from these courts confirming" that his case was properly filed, and asked that the Court "provide an update[.]" [Dkt. No. 8 at 1]. Second, Cooper states in his opposition that "the Marshall's [sic] in fact sent my forms back to

---

[11] Defendants repeatedly claim that "Defendant Christine Larkin has not been properly served with the summons and complaint[.]" [See, e.g., Dkt. Nos. 27 at 1 n.1; 27-1 at 1 n.1]. However, Defendants never expound on this claim and have never moved this Court to dismiss Larkin as a Defendant based on insufficient service of process under Fed. R. Civ. P. 4(e). Indeed, Defendants' 12(b)(5) motion to dismiss argues only that Cooper's service was untimely under Rule 4(m). [See Dkt. No. 27-1 at 13–14]. The summons served on Larkin was timely and, therefore, proper at least in this limited respect.

me 3 times citing incomplete information on the defendants," which contributed to the delay in finalizing the summonses.  [Dkt. No. 30 at 5].  Third, Cooper points to various factors that impeded timely service—the impact of COVID-19, incarceration, indigency, and his inability to control other circumstances bearing on service.  [Id. at 7].  Lastly, while the summonses indicate that the USMS served Defendants (other than Larkin) on March 22, 2021, they also show that Cooper signed the summonses weeks earlier, on February 23, 2021.  [Dkt. Nos. 16–22].  This is only two weeks after Cooper's February 8, 2021 deadline to effect service.  Hence, a two-week delay only is attributable to Cooper and once the summonses were delivered to the USMS, service was out of Cooper's control.  "[T]aken collectively," these circumstances demonstrate that Cooper was diligently attempting to meet the service deadline set by the Court, and this record establishes good cause under Rule 4(m).  See Bobola, 204 F. Supp. 3d at 388.

### B.   Motion to Dismiss for Failure to State A Claim Pursuant to Fed. R. Civ. P. 12(b)(6)

#### 1.   Applicable Legal Standards

Alternatively, Defendants move to dismiss the complaint for failure to state a claim on which relief can be granted.  [Dkt. No. 27].  "On a Rule 12(b)(6) motion to dismiss, the Court 'must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom.'"  Burnham v. Massachusetts, 299 F. Supp. 3d 319, 321 (D. Mass. 2018) (alterations in original) (quoting Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007).  That said, Cooper still must "state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  His factual allegations "must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Id. at 555 (citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that

a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 556). "Plaintiffs are obliged," therefore, "to set forth in their complaint factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable legal theory." Miranda Otero v. P.R. Indus. Comm'n, 441 F.3d 18, 21 (1st Cir. 2006) (quotation omitted). However, a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). Because Cooper is proceeding pro se, his pleadings are "held to less stringent standards than formal pleadings drafted by lawyers and are read liberally on a motion to dismiss." Cavitt v. Mass. Dep't of Corr., 512 F. Supp. 3d 149, 153 (D. Mass. 2021) (citing Boivin v. Black, 225 F.3d 36, 43 (1st Cir. 2000)). Nevertheless, "pro se pleadings must . . . follow procedural and substantive law and, therefore, present sufficient facts to suggest an actionable claim." Id. (citations omitted).

There are two elements to a claim brought under 42 U.S.C. § 1983: "1) that the conduct complained of has been committed under color of state law, and 2) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." Navedo v. Maloney, 172 F. Supp. 2d 276, 283 (D. Mass. 2001) (citing Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999)). It is undisputed that in receiving and responding to Cooper's sexual assault complaint, Defendants were acting under the color of state law. Cf id. (plaintiff's "failure to use the term 'color of state law' in the initial complaint is not dispositive of the issue."). The relevant inquiry, therefore, is whether Cooper sufficiently alleged that Defendants violated his federally protected rights.

10

### 2.   Eighth Amendment Claim: Inmate-on-Inmate Violence

Cooper alleges that Defendants violated his rights by "failing to protect him" from Glover. [Dkt. No. 2 ¶ 19].  There are two categories of Defendants here—officers with whom Cooper interacted directly and supervisors with whom he had no interaction.  Each is assessed in turn.

#### i.   Direct Liability Against Dupuis and Sheedy

Cooper alleges that he directly reported his interactions with Glover prior to the November 17, 2019 assault to two officers: Dupuis and Sheedy.  Cooper's Eighth Amendment claims against Dupuis and Sheedy, therefore, sound in direct liability—that by their own conduct they violated Cooper's Eighth Amendment rights.  [See Dkt. No. 2 ¶¶ 13–14].  "The Eighth Amendment protects the incarcerated community from cruel and unusual punishment," and "imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates."  Norton v. Rodrigues, 955 F.3d 176, 185 (1st Cir. 2020) (quotations omitted).  "Prison officials, therefore, 'have a responsibility not to be deliberately indifferent to the risk to prisoners of violence at the hands of other prisoners.'"  Id. (quoting Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002)).  "Nevertheless, '[n]ot every injury suffered by a prisoner at the hands of another results in constitutional liability on the part of prison officials.'"  Id. (alterations in original) (quoting Burrell, 307 F.3d at 7–8).  "Instead, two requirements must be met for a prison official to have violated an incarcerated person's Eighth Amendment rights in the context of inmate-on-inmate violence."  Id. First, the inmate "must be incarcerated under conditions imposing a substantial risk of serious harm," and second, prison officials "must possess a sufficiently culpable state of mind, namely one of deliberate indifference to an inmate's health or safety."  Id. (cleaned up).  To establish deliberate indifference, a plaintiff must show that prison officials had "knowledge of a substantial risk of serious harm" and had "an unreasonable response to the same."  Id.

Cooper's complaint does not allege sufficient facts against Dupuis and Sheedy to satisfy these elements. As an initial matter, Cooper's allegations are insufficient because he does not allege that he reported to Dupuis or Sheedy a concern for his safety. In his affidavit, Cooper states that he "spoke" to Dupuis and "told" Sheedy about the sexually suspicious behavior involving Glover and another inmate on November 10, 2019. [Dkt. No. 3 at 1]. Indeed, that sexual behavior did not involve Cooper. Similarly, in his November 18, 2019 "Inmate Grievance Form," Cooper wrote that he "spoke" to Dupuis and "briefly spoke" to Sheedy. [Id. at 21]. And in his December 13, 2019 "Inmate Grievance Form," Cooper wrote that he informed Sheedy that he was "deeply disturbed" and told Dupuis that he "was not looking for trouble . . . but was very bother[ed] by inmate Glover exposing his genitals[.]" [Id. at 10]. There is nothing about the content or tone of these allegations to indicate that Cooper reported being fearful or at "a substantial risk of serious harm." To the contrary, Cooper alleges in his affidavit that he was initially reluctant to report Glover's conduct to staff at all, opting instead to speak to two inmates about the merits of reporting. [Id. at 1, 21]. Lastly, his allegation that staff "knew fully that this at risk [sic] issue existed, sexual misconduct was ignored and no action was taken" [id. at 3] is conclusory and precisely the type of allegation that will not suffice. In sum, Cooper's pleadings fail to allege that his reports put Sheedy and Dupuis on notice of a substantial risk of serious harm to his safety, or indeed that Cooper felt himself at such a risk.

In his opposition, Cooper attempts to overcome these deficiencies, contending that prison staff should have known he was at risk because of Glover's history of sexual misconduct. Cooper argues that "Inmate Glover's name was in fact well-known to the IPS department to include Robert Sheedy" and that Defendants "cannot assume what any inmate might do in these types of circumstances." [Dkt. No. 30 at 13]. According to Cooper, "[t]o assume there is no immediate or

future risk based on my lack of saying that I fear for my safety does not hold true to the reality of the situation." [Id.]. Cooper also avers that "Glover escalating from words to exposing his genitals" was "indicative that there [was] a serious issue transpiring" and that Glover "pose[d] an unreasonable risk of serious damage to [Cooper's] present and future health." [Id.]. These arguments are based on speculation about what prison staff knew and should have inferred. Additionally, at the motion to dismiss stage the Court must evaluate the sufficiency of the pleadings, not arguments made in an opposition to dismissal. See, e.g., Murphy v. Yard, No. 20-40043-TSH, 2021 WL 4295842, at *3 (D. Mass. Sept. 21, 2021) (plaintiff "cannot avoid dismissal of his complaint by asserting new facts and legal claims in his opposition that cure the deficiencies in his original pleading."). Cooper's arguments ignore the fact that his reports were not urgent and did not communicate directly or inferentially that he felt himself at a serious risk of harm. Rather, Cooper himself concedes that he "can't ascertain what Glover's intent [was] no more then [sic] the defendants can," suggesting that he made no assumptions about Glover's intent. [Dkt. No. 30 at 15].

Cooper's claim that Dupuis or Sheedy violated his Eighth Amendment right are insufficient and should be dismissed.

### ii. Supervisory Liability Against Hagelberg, Hough, Findley, Divris, Ladouceur or Larkin

Cooper does not allege that he made any reports to, or even interacted with, Defendants Hagelberg, Hough, Findley, Divris, Ladouceur or Larkin prior to November 17, 2019, so his route to recovery against these Defendants for an inmate-on-inmate Eighth Amendment claim depends on supervisory liability rather than direct liability. To establish supervisory liability "plaintiff must plausibly allege that 'one of the supervisor's subordinates abridged the plaintiff's constitutional rights' and then forge an affirmative link between the abridgement and some action or inaction on

the supervisor's part." Parker v. Landry, 935 F.3d 9, 14 (1st Cir. 2019) (quoting Guadalupe-Báez v. Pesquera, 819 F.3d 509, 514 (1st Cir. 2016)). This is "separate and distinct from concepts such as vicarious liability and respondeat superior;" the supervisor's "own acts or omissions must work a constitutional violation." Id. at 15 (citations omitted). To show such a constitutional violation, Cooper must allege, at a minimum, "facts showing that the supervisor's conduct sank to the level of deliberate indifference." Id. (citing Guadalupe-Báez, 819 F.3d at 515). Deliberate indifference has "three components: the plaintiff must show (1) that the officials had knowledge of facts, from which (2) the officials can draw the inference (3) that a substantial risk of serious harm exists." Id. (cleaned up). Cooper must "also allege facts giving rise to a causal nexus between the supervisor's acts or omissions and the subordinate's misconduct." Id.

Cooper's allegations do not meet this standard. As an initial matter, the allegations do not satisfy the three elements for deliberate indifference. First, Cooper never alleged that "the officials had knowledge of facts." Indeed, Cooper repeatedly claims the opposite—that Dupuis and Sheedy failed to relay his complaints to their supervisors.[12] As for the second and third elements, Cooper's allegations against the supervisory Defendants are insufficient for the same reasons his allegations against Dupuis and Sheedy are insufficient—the reports Cooper made to Dupuis or Sheedy would not have caused their supervisors to infer that "a substantial risk of serious harm exist[ed]." Further, Cooper's allegations do not "give[] rise to a causal nexus between the supervisor's acts or omissions and the subordinate's misconduct." There is nothing in Cooper's complaint or affidavit suggesting that Dupuis or Sheedy failed to protect him because of something their supervisors did,

---

[12] Cooper alleges one instance of reporting—that after Cooper made his report to Dupuis on November 13, 2019, Dupuis "did not call the shift commander. But notified Christine Larkin." [Dkt. No. 3 at 1]. This allegation is contrasted with Cooper's repeated claims in his complaint that Dupuis and Sheedy failed to notify any supervisor or take any action on his reports. [E.g., Dkt. No. 2 ¶¶ 13 ("zero action was taken"), 14 ("no one acted")].

or that the inmate-on-inmate assault was the result of the acts or omissions of Hagelberg, Hough, Findley, Divris, Ladouceur or Larkin.

The undersigned concludes that Cooper has not sufficiently alleged that Hagelberg, Hough, Findley, Divris, Ladouceur or Larkin breached the Eighth Amendment via supervisory liability, and recommends that this claim be dismissed.

### 3. Eighth Amendment Claim: Unconstitutional Conditions of Confinement

In his complaint, Cooper alleges that he was held in segregation after he was charged with aggravated assault, and that this violated his Eighth Amendment rights because he was eventually found "not guilty" in a disciplinary proceeding. [Dkt. No. 2 ¶ 15]. Cooper reiterated this allegation in his affidavit, maintaining that he was "unjustly held in segregation because Hagelberg and team tried to make it seem like [he] had committed an assault" and emphasizing that he "spent 116 days in isolation awaiting a hearing!" [Dkt. No. 3 at 2, 3]. Although Defendants "move the Court to dismiss all counts of the Plaintiff's Complaint," they do not address the basis for dismissing this Eighth Amendment challenge to Cooper's segregation. [See Dkt. No. 27 at 1]. The Court does so sua sponte and recommends that dismissal be granted.[13]

---

[13] Although Defendants moved to dismiss "all counts" of Cooper's complaint, the Court nonetheless treats this aspect of their motion as sua sponte because of their failure to discuss the Eighth Amendment segregation issues directly. Defendants' motion did not put Cooper on notice of any arguable deficiencies in his segregation claim. Cf. Gonzalez-Gonzalez v. United States, 257 F.3d 31, 36 (1st Cir. 2001) ("If a defendant files a motion to dismiss for failure to state a claim . . . the plaintiff, as a practical matter, has notice of the motion and an opportunity to amend the complaint[.]" (citations omitted)). The Court "has the authority to dismiss a complaint *sua sponte* for failure to state a claim," Flemon v. Mass. Atty. Gen., Nos. 13-11518-RWZ, 13-11523-RWZ, 2013 WL 3732880, at *3 (D. Mass. July 12, 2013), but such dismissal is "strong medicine, and should be dispensed sparingly." Gonzalez-Gonzalez, 257 F.3d at 33. The First Circuit has noted that "a sua sponte order of dismissal" may be appropriate "if the allegations contained in the complaint, taken in the light most favorable to the plaintiff, are patently meritless and beyond all hope of redemption." Id. at 37. Evaluating Cooper's allegations under the standards of unconstitutional conditions of confinement, that claim is patently insufficient as a matter of law. The undersigned recommends dismissal without prejudice—if Cooper intends to allege that conditions of segregation violated the Eighth Amendment, such an order would preserve his ability to do so.

"Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards." Hutto v. Finney, 437 U.S. 678, 685 (1978).  To support a claim for "unconstitutional conditions of confinement" under the Eighth Amendment, "a plaintiff must prove (1) that he suffered a deprivation as a result of confinement that is, 'objectively, sufficiently serious' and (2) that the deprivation resulted from conduct by prison officials who possessed a 'sufficiently culpable state of mind.'" Tavares v. Gelb, No. 15-13000-FDS, 2016 WL 6518428, at *8 (D. Mass. Nov. 2, 2016) (citing Burrell, 307 F.3d at 8).  To determine whether confinement resulted in a deprivation that is "objectively, sufficiently serious," the Court examines the "conditions" of segregation taken "as a whole," including "the severity" as well as "the length of confinement[.]"  See Hutto, 437 U.S. at 686–87; see also Tavares, 2016 WL 6518428, at *9 ("The Supreme Court has likewise found that the length of segregated detention is merely one factor among many to consider in evaluating an inmate's constitutional claims.").  To determine the existence of a "sufficiently culpable state of mind" the Court considers whether the allegations show "'deliberate indifference' to an inmate's health or safety" that "is more blameworthy than negligence." Burrell, 307 F.3d at 8 (citing Farmer v. Brennan, 511 U.S. 825, 834–35 (1994)).

Cooper fails to plead facts that meet this standard.  He did not allege anything regarding conditions of segregation, such as inhabitable or unsanitary conditions, inadequate food, lack of access to outdoor time, or restrictions on reading materials or other activities. Cf. Hutto, 437 U.S. at 682–83 (district court found conditions of confinement unconstitutional where "isolation was for an indeterminate period of time," and as many as "10 or 11" prisoners were "crowded into windowless" cells without access to flushing toilets or adequate food).  Rather, Cooper offers nothing more than an undeveloped assertion in his opposition that "for all those months spent in segregation" he was "without [his] normal privileges otherwise enjoyed by an innocent man in

general population." [Dkt. No. 30 at 11].  This sole statement, however, is conclusory and does not suffice to rescue Cooper's otherwise deficient allegations.  As to the first element, then, Cooper's claim appears to rely exclusively on the length of his segregation—according to Cooper, 116 days.  [See Dkt. No. 3 at 3].  However, it is settled that prolonged isolation, without more, does not amount to a violation of the Eighth Amendment, and Cooper's allegations are therefore insufficient.  See Tavares, 2016 WL 6518428, at *9 ("courts have not found that segregated detention alone, even when prolonged or of indefinite duration, constitutes cruel and unusual punishment" and "there is no clearly established constitutional right to be free from detention in administrative segregation" even for a period as long as "two and a half years."); Graham v. Grondolsky, No. 08-40208-MBB, 2012 WL 405459, at *12 (D. Mass. Feb. 7, 2012) (citing Hutto as "reject[ing] the idea that prolonged isolation was in itself cruel and unusual punishment").

Additionally, there is nothing objectively offensive in the imposition of segregation. Cooper was not placed in segregation until after he assaulted Glover—and there is no question that Cooper assaulted Glover.  At least one officer witnessed the assault.  Officer White, the first to respond, testified that he "observed" Cooper kicking Glover in the head area with a shod foot while Glover was "on the floor in a fetal type position."  [Dkt. No. 3 at 6–7].  Indeed, Cooper does not deny the assault.  Rather, Cooper admits that he hit and kicked Glover, alleging he was provoked when Glover nudged him—which an independent witness corroborated—and put his hand on Cooper's left buttocks—which was not corroborated.  [Id. at 1, 7].  Defendants' decision to place Cooper in segregation after he assaulted another inmate, before a full hearing determined that assault was in self-defense, was not unreasonable.

For these same reasons, Cooper's Eighth Amendment segregation claim does not plausibly allege that prison officials possessed "a sufficiently culpable state of mind" when they placed him

in segregation.  See Tavares, 2016 WL 6518428, at *8 (citation omitted).  The record shows that prison officials conducted an investigation and obtained witness statements—including from responding officer White who saw the assault—to make a not unreasonable determination that Cooper should be placed in segregation until a full disciplinary hearing could be conducted.  Cooper's most salient allegation on Defendants' state of mind is that "Hagelberg and team tried to make it seem like [Cooper] had committed an assault to shift the blame and spotlight the victim" to ensure that Hagelberg's "failure would not be looked at."  [Dkt. No. 3 at 2].  However, this is implausible given that Cooper does not deny that he struck Glover and was seen kicking him while Glover was largely defenseless on the floor.  At its core, Cooper's real grievance seems to be that "Hagelberg and team" did not endorse his self-defense claim at the time of the assault or shortly thereafter, which (in his view) they should have done given that McGonagle eventually found the charge not proved and that assault justified.  [Id. at 8].  But the findings at the disciplinary hearing—after testimony, exhibits, and arguments of counsel—fail to establish that any Defendant possessed the requisite culpable state of mind to support an Eighth Amendment claim at the time of the assault and before the disciplinary hearing.  [See id. at 4–8].  Indeed, once it was determined that the assault was not proved, Cooper was released from segregation.  While the Court must accept Cooper's factual allegations as true, the Court is not required to "swallow the plaintiff's invective hook, line, and sinker," and does not do so here.  Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996); see also Rivera v. City of Worcester, No. 12-40066-TSH, 2012 WL 5354153, at *2 (D. Mass. Oct. 26, 2012).  In sum, there is no credible factual allegation that prison officials acted with a culpable state of mind.

Considering the above, Cooper's claim that Defendants violated the Eighth Amendment by placing him in segregation should be dismissed.

### 4.   Fourteenth Amendment Claim: Breach of Due Process

Cooper alleges in his complaint that "Defendants did clearly violate" his Fourteenth Amendment rights by giving "no process due . . . by law . . . and depriv[ing] him of his property and freedom to cover up their wrongdoing."[14]  [Dkt. No. 2 ¶ 19].  "Prisoners may . . . claim the protections of the Due Process Clause.  They may not be deprived of life, liberty, or property without due process of law."  Wolff v. McDonnell, 418 U.S. 539, 556 (1974); see also Linton v. O'Brien, 142 F. Supp. 3d 215, 218 (D. Mass. 2015) (quoting Wolff).  "When an inmate brings a § 1983 claim arising from the Due Process Clause, the court must 'first ask whether there exists a liberty or property interest of which a person has been deprived, and if so [] ask whether the procedures followed by the State were constitutionally sufficient.'"  Linton, 142 F. Supp. 3d at 218 (alterations in original) (quoting Swarthout v. Cooke, 562 U.S. 216, 219 (2011)).  When the state "create[s] the right" and recognizes that the deprivation of that right is "a sanction for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated."  Wolff, 418 U.S. at 557.

In their motion to dismiss, Defendants argue that "Cooper does not even meet the first requirement to make a due process claim as he has no constitutional property interest at stake," and cite several decisions concerning prisoner funds and restitution.  [Dkt. No. 27-1 at 11 n.4].  Defendants' analysis of Cooper's due process claim is misguided.  Whether or not Cooper had a

---

[14] In his opposition, Cooper deviates from his original due process claim and asserts that his claim is "about how the defendants used [the disciplinary] process to deny [Cooper] of [his] (liberty)for [sic] all those months spent in segregation without [his] normal privileges otherwise enjoyed by an innocent man in general population." [Dkt. No. 30 at 11].  For one, this claim was already addressed and found insufficient.  See supra section II.B.3.  Regardless, at the motion to dismiss stage the Court must evaluate the pleadings, not Cooper's opposition.  See Murphy v. Yard, No. 20-40043-TSH, 2021 WL 4295842, at *3 (D. Mass. Sept. 21, 2021).  Accordingly, Cooper's Fourteenth Amendment claim depends on his allegations that he was denied due process.

"property interest at stake," it is evident that he has a liberty interest.  Massachusetts "created" a right of "equal access to the grievance process," triggering the protections of due process.  See Wolff, 418 U.S. at 557; see also 103 Code Mass Regs. 491.00 et seq. (2021) ("Inmate Grievances").  The undersigned concludes that Cooper has a liberty interest in proper grievance procedures and evaluates whether that interest was denied in violation of Fourteenth Amendment due process.

There are three minimum due process requirements applicable to disciplinary proceedings against a prisoner: "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action."  Tibbs v. Samuels, No. 13-11095-DJC, 2017 WL 1164484, at *10 (quotation omitted); see also Wolff, 418 U.S. at 563–66 (establishing due process requirements for prisoners); Hatch v. Lappin, 660 F. Supp. 2d 104, 112 (D. Mass. 2009) (listing factors and citing Wolff).  Cooper does not allege that Defendants failed to meet these requirements.  Indeed, his allegations show the opposite.  Cooper was "served notice of ticket #449269" in writing.  [Dkt. No. 3 at 1].  He then had time to secure representation, gather evidence and prepare his case before the hearing.  [Id. at 1–2, 4–8].  At the hearing, Cooper's student attorney introduced evidenced, examined witnesses, and called Cooper to testify in his own defense.  [Id.].  The factfinder issued a thorough decision, which, as Cooper repeatedly emphasizes, found Cooper "not guilty" of the charges.  [Id.].

The only allegation Cooper asserts that could be understood as showing impropriety in the disciplinary process is that, in Cooper's view, Hagelberg lied "on the record" by testifying that Cooper never filed a PREA report prior to the November 17, 2019 assault, and that there was no evidence of prior incidents between Cooper and Glover.  [Id. at 2, 7].  Cooper harps on this

contention throughout his pleadings.  Cooper emphasizes that Hagelberg's testimony ignored the fact that several individuals confirmed Cooper's version of events, with one "credible source" even corroborating that Glover nudged Cooper from behind.  [Id.].  Cooper's attachments discuss written documents that contradict Hagelberg's testimony, and Hagelberg's sworn concession that Glover was not credible and Cooper was.  [Id.].  Cooper's representation also had Hagelberg read portions of a document at the hearing that contradicted his earlier testimony.  [Id. at 7].  Even accepting all this as true, however, Cooper's allegation that Hagelberg provided false testimony does not amount to a due process violation.  As indicated in Tibbs, the due process inquiry concerns whether the process as a whole stripped plaintiff of "any procedural due process rights."  See 2017 WL 1164484, at *11.  At the expense of the robust process Cooper received, Cooper's focused attack on Hagelberg misses the point that the disciplinary process he received was thorough and impartial—as evidenced by McGonagle's finding that the charges were not proven and that Cooper was acting in self-defense.  [Id. at 8]

In sum, the undersigned finds that Cooper has not sufficiently alleged that his rights under the Fourteenth Amendment were breached and recommends that this claim be dismissed.

### 5.  PREA and SHARPP as Causes of Action

Cooper repeatedly alleges that Defendants failed to follow proper procedures under PREA and the DOC's policy implementing PREA—the Sexual Harassment/Abuse Response and Prevention Policy ("SHARPP"). [15]  [See, e.g., Dkt. Nos. 2 ¶ 13 ("staff per policy received notifications of Dupuis email [sic] since it was a confidential PREA email.  No one reacted, no

---

[15] See Massachusetts Department of Corrections, 103 DOC 519 Sexual Harassment/Abuse Response and Prevention Policy (effective July 1, 2021), https://www.mass.gov/doc/doc-519-sexual-harassmentabuse-response-prevention-policy/download [hereinafter, "SHARPP"].  SHARPP is the policy enforcing PREA protections in Massachusetts. See id. at 1 (noting that the "PREA Coordinator" and "PREA Managers" are among those responsible for "Implementation and Monitoring" of SHARPP).

one did anything[.]"); 3 at 3 ("PREA law . . . has zero tolerancy [sic] mandates.  This was adopted into the SHARPP Policy 519.").  In their motion to dismiss, Defendants focus on SHARPP and argue that it does not afford Cooper "a private right of action for enforcement of damages."  [Dkt. No. 27-1 at 10–11].  Whether Cooper's allegations are assessed as claiming under PREA or SHARPP individually or collectively, the motion to dismiss should be allowed.

"PREA was enacted by Congress in 2003 to address the problem of rape in prison by creating national standards to prevent, detect, and respond to sexual abuse and sexual harassment within confinement settings."  Conley v. Bardon, No. 20-12196-IT, 2021 WL 3550799, at *4 (D. Mass. Aug. 11, 2021) (citing 34 U.S.C. §§ 30301–02).  PREA directed the Attorney General to "publish a final rule adopting national standards for the detection, prevention, reduction, and punishment of prison rape," which was codified at 28 C.F.R. §§ 115.5 and 115.6.  See id.; 34 U.S.C. § 30307.  While PREA standards ensure that sexual abuse and harassment in prisons are addressed, the statute "does not create a private cause of action for allegations of prison rape, nor does it grant prisoners any specific rights that can be asserted under section 1983."  Conley, 2021 WL 3550799, at *4 (citations omitted); see also Ventre v. Forgues, No. 11-40205-TSH, 2013 WL 597643, at *5 (D. Mass. Feb. 14, 2013) ("PREA is merely a record of congressional finding and does not create a private right of action.").  SHARPP likewise does not create a private cause of action.  "For DOC policies to carry the full force of law and be binding on the DOC, they 'must be promulgated in accordance with the [Procedure Act].'"  Ventre, 2013 WL 597643 at *6 (alterations in original) (quoting Dougan, et al. v. Commissioner of Correction, et al., 607 N.E.2d 763, 764 (Mass. App. Ct. 1993)).  SHARPP is an "internal management" policy, not a "promulgated regulation[] under the Procedure Act" and is "not published in the [Code of

Massachusetts Regulations].” Id.  As such, SHARPP has no “statutory force” and claims brought
pursuant to SHARPP are “subject to dismissal.” Id.

Neither PREA nor SHARPP affords Cooper a private cause of action.   Whether
independent of each other or addressed collectively, Cooper's claims under PREA and SHARPP
should be dismissed.

### C.   Qualified Immunity

Defendants move to dismiss Cooper's complaint on the ground of qualified immunity.
[Dkt. No. 27-1 at 14–15].   Qualified immunity shields “government officials performing
discretionary functions” from civil damages, “insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a reasonable person would have known.”
Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The standards for evaluating qualified immunity
are well-established:

> When a defendant invokes qualified immunity, an inquiring court typically engages
> in a two-step pavane.  First, the court must determine whether the plaintiff's version
> of the facts makes out a violation of a protected right.   Second, the court must
> determine whether the right at issue was clearly established at the time of
> defendant's alleged misconduct.

Norton, 955 F.3d at 184 (cleaned up).  First, in light of this Court's determination that Cooper fails
to sufficiently plead “facts [that] make[] out a violation of a protected right,” Defendants are
entitled to qualified immunity.  But Defendants would be entitled to qualified immunity even if
Cooper had sufficiently alleged violations of his constitutional rights due to the second step of the
qualified immunity inquiry.  The onus is on the plaintiff to “identify either controlling authority or
a consensus of cases of pervasive authority” that are “sufficient to signal to a reasonable official
that particular conduct would violate a constitutional right.” Id. (cleaned up).  Cooper fails to do
so.  Instead, he argues in his opposition that “[a]ny official who acts under the color of state law

and deprives any person of any rights secured under the constitution is not immune from being held liable." [Dkt. No. 30 at 1]. This is an incorrect statement of the law. Cooper fails to identify what law or authority he contends would have signaled to Defendants that their conduct was unconstitutional, and the undersigned is aware of none. The undersigned concludes that Defendants are entitled to qualified immunity and recommends that the complaint be dismissed.

## III.   COOPER'S MOTION FOR DOCUMENTS AND/OR DISCOVERY

When Cooper filed his opposition to Defendants' motion to dismiss, he also filed a "MOTION for Production of documents and or discovery[.]" [Dkt. No. 31 at 1]. Cooper bases this motion on "Rule #34 of the Federal Rules Of Civil Procedure," and asks that Defendants produce various reports, documents, photographs and other investigative findings. [Id. at 1, 3]. This motion is denied for two reasons. First, having recommended that the Court grant Defendants' motion to dismiss, discovery cannot proceed. However, even if the Court were to deny Defendants' motion to dismiss, Cooper's motion for discovery must be denied because the vehicle for discovery is not a motion, but a request for production of documents under Fed. R. Civ. P. 34, which makes clear that such requests "may [be] serve[d] on any other party" without Court involvement. Cooper's "MOTION for Production of documents and or discovery" is denied.

## IV.   CONCLUSION

The undersigned recommends that Defendants' motion to dismiss pursuant to Rule 12(b)(5) be DENIED, but that their motion to dismiss pursuant to Rule 12(b)(6) be GRANTED without prejudice. The Court orders that Cooper's motion for discovery is DENIED.

## V.   REVIEW BY DISTRICT JUDGE.

The Parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2), they are entitled to object to the Court's Report and Recommendation on Defendants'

motion to dismiss, by filing a specific written objection with the Clerk of this Court within fourteen (14) days of service of this Report and Recommendation.  Such written objections must specifically identify the portion of the Report and Recommendation to which objection is made and the basis for those objections.  The Parties are further advised that the First Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) shall preclude further appellate review.  See, e.g., M. v. Falmouth Sch. Dep't, 847 F.3d 19, 26 (1st Cir. 2017); Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988).

The Court's Order denying Cooper's "MOTION for Production of documents and or discovery" cannot be objected to by the Parties.  However, District Judge Hillman maintains the power to "reconsider" this decision "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."  28 U.S.C. § 636(b).


/s/ David H. Hennessy
David H. Hennessy
United States Magistrate Judge